No. 126,238

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

LEVI WILLIAM KEMP,
*Appellant*.

SYLLABUS BY THE COURT

1.

Hearsay is generally inadmissible unless a statutory exception applies. K.S.A. 2023 Supp. 60-460(m) sets forth the requirements for a writing to meet the business-records exception to the rule against hearsay.

2.

For a party to admit a domestic business record under K.S.A. 2023 Supp. 60-460(m) without live testimony from the record's custodian or through a business-records subpoena, the party must produce a self-authenticating certification that complies with K.S.A. 2023 Supp. 60-465(b)(7). K.S.A. 2023 Supp. 60-465(b)(7) requires in part that any "[c]ertified domestic records of a regularly conducted activity" be certified by a custodian or other qualified person "in an affidavit or a declaration pursuant to K.S.A. 53-601."

3.

K.S.A. 53-601 generally allows an unsworn written declaration subscribed by the person as true under the penalty of perjury to have the same force and effect as a sworn written declaration, verification, certificate, statement, oath, or affidavit.

1

4.

Any such written declaration executed outside the state of Kansas must substantially comply with the form of K.S.A. 53-601(a)(1). Substantial compliance may be found where the declaration complies with the spirit and intent of the law, but not with its absolute letter.

5.

The spirit and intent of K.S.A. 53-601(a)(1)'s requirement that an out-of-state declaration be under penalty of perjury under "'the laws of the state of Kansas'" is to ensure reliability of the statement by: (1) requiring the declarant to make their statement under penalty of perjury; and (2) allowing the possibility of criminal prosecution in Kansas for knowingly making a false representation. If an out-of-state declaration meets these objectives, it is likely to be in substantial compliance with the form in K.S.A. 53-601(a)(1).

6.

A prosecutor does not impermissibly dilute the State's burden to prove the defendant guilty beyond a reasonable doubt by discussing in voir dire the fact that the judge is not going to define "beyond a reasonable doubt." But a prosecutor does commit error by suggesting that the jurors discuss and vote on the meaning of "beyond a reasonable doubt."

Appeal from Sedgwick District Court; DAVID DAHL, judge. Submitted without oral argument. Opinion filed February 28, 2025. Affirmed.

*Jacob Nowak*, of Kansas Appellate Defender Office, for appellant.

*Lance J. Gillett*, assistant district attorney, *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

2

Before COBLE, P.J., GARDNER, J., and CARL FOLSOM III, District Judge, assigned.

FOLSOM, J.: Levi Kemp appeals his convictions of six counts of sexual exploitation of a child. Kemp challenges the district court's admission of certain emails and computer records at his jury trial, claiming that the records were inadmissible hearsay and failed to meet the business-records exception under K.S.A. 60-460(m). He also asserts a claim of prosecutorial error in voir dire. Finding no reversible error, we affirm.

FACTUAL AND PROCEDURAL HISTORY

In October 2019, Oath Holdings, Inc.—the parent company of Yahoo—sent a cyber tip to the National Center for Missing and Exploited Children (NCMEC) regarding suspected child-sexual-abuse materials detected in one of its accounts. NCMEC referred the matter to Detective Stephanie Neal with the Wichita Police Department, who then obtained a series of search warrants to investigate the matter. On October 29, 2019, Detective Neal obtained a search warrant for email and computer records from Oath Holdings, which is based in California. A legal analyst for Oath Holdings subsequently provided the documents sought by the search warrant—the contents of which are the subject of this appeal.

The legal analyst, Maria Abruzzini, mailed the records to Detective Neal on November 11, 2019, explaining in an accompanying letter that "Oath [Holdings] hereby produces the enclosed responsive data in accordance with state and federal law, including the Stored Communications Act. A declaration authenticating these records is also enclosed." This letter was Exhibit 22 at Kemp's trial.

In the business-records declaration, Abruzzini identified herself as the custodian of records for Oath Holdings. She explained that Oath Holdings was located in California and stated, "I make this declaration in response to a search warrant dated October 29,

2019 ('the request'). I have personal knowledge of the following facts . . . and could testify competently thereto if called as a witness."

The declaration then stated that the records included subscriber information, dates, times, and IP addresses for logins and authentication events, and content of the email account. The declaration also explained how the records were accurate copies and that the data was kept in the "regularly conducted business activity, as was made by Oath as a regular practice." Thus, it stated the declaration was intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence. Lastly, Abruzzini signed the declaration "under penalty of perjury under the laws of the United States of America that the foregoing is true and correct."

Prior to trial, the State filed a motion to determine the admissibility of this evidence. The motion stated, "The State intends to admit these business records pursuant to K.S.A. § 60-460(m) business entries, 60-460(g) admission by party, and 60-460(j) declarations against interest." The district court held a pretrial hearing on the motion.

At the motion hearing, the State explained the relevance of this evidence:

"[T]he State anticipates the evidence in this trial will begin with the search of the defendant's phone and ultimately locating images on the defendant's phone that are classified as child pornography. There are five specific images of an individual with the initials A.C., and those five specific images do qualify as child pornography and were taken by the defendant's phone and include the defendant, either his hands or parts of his body, in this series of images, as well as some additional images that were taken at the same time which would not qualify as child pornography but are part of what I would call the same series that show the defendant more clearly or show parts of his clothing that are also taken in other images.

"So, primarily, the search of the defendant's phone results with these five child

4

pornography images of A.C. located on the phone, and then the search continues on his phone, and there are several hundred images of child pornography located on his phone, as well, either videos or images. . . .

"For this motion, the State would like to admit some additional evidence related to all nine of these charges, and specifically it's relevant to the issue of whether the defendant promoted a performance of sexually explicit material knowing the content and the character of that—those images or of that performance. So, additionally, after the search of the phone, the detective served a number of other search warrants, but two specific are relevant for this motion. One is a search warrant to Dropbox for the defendant's account, and then another is a search warrant to Oath Holdings, which is the company that owns and operates Yahoo e-mail.

"So when the detective receives the response back from the search warrants, both sets of records are accompanied by a certificate of business records or an authentication declaration by both of the respective businesses, and then the contents of those accounts, which include subscriber information, as well as images containing child pornography that were in the accounts, are sent back to the detective and those records are maintained by law enforcement because of the nature of those images."

Defense counsel objected to the offer of business records:

"The business records exception applies to people who are familiar with the business, and me serving warrants or subpoenas on the company and getting their records doesn't make me somebody involved in the company to allow them to come in and testify about the business records exceptions. So I think that the State needs to provide some link to the purported communications and my client, not just having an officer come in and say, 'This is what I saw and it's reliable because I saw it.'"

The State countered:

"I would submit that the certification that is returned with the search warrant return and with the contents should stand in place of an individual person from that business coming in to testify. They would be testifying and merely authenticating the

5

records, and that's what this certification does, and the certification for the business records from both of these respective companies satisfies the requirements of 60-460(m).

". . . So I believe that the certificate of business records is going to satisfy all that is required within that hearsay exception so the State would submit that the certificate of business records satisfies the authentication concerns and qualifies the content of those records to be admitted through 60-460(m)."

The court agreed with the State and ruled that the documentary exhibits could be authenticated by a business-records affidavit, without a witness from the business having to testify. The court ruled that the documents would not be excluded as hearsay—"[t]hey are admissible under the business records exception, they are admissible also under the admission by parties." There was no specific discussion about any constitutional right to confront witnesses.

At the start of trial, for the first time, the State provided Kemp's counsel with a copy of the business-records declaration from Oath Holdings. Kemp's counsel then objected to the admission of the emails based on failure to meet the requirements of K.S.A. 60-460(m):

"I would still object. I think under 60-460(m) it does not qualify. I believe it says if the testimony of the custodian or other qualified witness or by a certification that complies with 60-465(b)(7), I believe it is, I still think that they need to bring somebody in just to go through the manner and the form of it and that it is in fact a business record for Oath Holdings, and, again, I would just note our objection."

The court ruled again that the evidence would not be excluded as hearsay. Citing *In re Care & Treatment of Quary*, 50 Kan. App. 2d 296, 324 P.3d 331, *rev. denied* 300 Kan. 1103 (2014), the court found that "the State is permitted to introduce business records with an affidavit pursuant to 60-460(m). Doesn't affect the State's burden of

6

proof, but the manner in which that burden may be carried. Once again, I find this is tantamount to an affidavit which has been submitted."

The district court also stated to Kemp's counsel that "the objections that you raised [at the evidentiary hearing] are still objections that will continue on through the end of trial." Nonetheless, Kemp contemporaneously objected to admission of the business-records declaration, saying, "I'd renew my previous objection." Kemp also contemporaneously objected to the admission of the subscriber data of the Yahoo account from Oath Holdings and to the relevance of the emails themselves. But the district court overruled all three objections.

The Yahoo email evidence was thus presented to the jury. It included emails from Kemp discussing the explicit materials, sharing the images though Dropbox links, and other explicit conversations relevant to the charges.

The jury convicted Kemp of six counts of sexual exploitation of a child. The district court sentenced Kemp to concurrent hard 25 life sentences on counts 1 through 5, with a consecutive 34-month sentence on count 6. Additional facts relevant to the prosecutorial-error claim will be presented below.

ANALYSIS

I.    *The district court did not err when it admitted out-of-state business records under K.S.A. 2023 Supp. 60-460(m) and K.S.A. 2023 Supp. 60-465(b)(7), because the custodian's declaration certifying the records substantially complied with K.S.A. 53-601(a)(1).*

Kemp argues that the Oath Holdings records should have been excluded from trial as hearsay under K.S.A. 60-460. He claims the business-records declaration failed to comply with K.S.A. 53-601(a)(l) because the certification was sworn to be true under the

7

penalty of perjury of "the laws of the United States of America" instead of "the laws of the state of Kansas." For this reason, he argues that the evidence did not meet the business-records exception to the hearsay rule in K.S.A. 60-460(m). Kemp maintains the district court made a legal error on this issue and thus abused its discretion by admitting this evidence.

Appellate courts review a district court's determination of hearsay admissibility for abuse of discretion. *State v. Gutierrez-Fuentes*, 315 Kan. 341, 351, 508 P.3d 378 (2022). An abuse of discretion may occur if: "(1) no reasonable person would take the view adopted by the trial court; (2) the action is based on an error of law; or (3) the action is based on an error of fact." 315 Kan. at 351. To the extent that statutory interpretation is necessary to resolve this issue, our review is unlimited. *State v. Betts*, 316 Kan. 191, 197, 514 P.3d 341 (2022).

Under the Kansas Rules of Evidence, hearsay is inadmissible unless a statutory exception applies. K.S.A. 60-460. In other words, hearsay is a general rule of exclusion. If an exception applies, the evidence may not be excluded as hearsay. But the evidence is not automatically admissible for that reason. It still must be relevant, and it cannot be inadmissible for some other reason. *State v. Hunt*, No. 125,629, 2023 WL 7983814, at \*3 (Kan. App. 2023) (unpublished opinion).

K.S.A. 2023 Supp. 60-460(m) defines the business-records exception to the hearsay rule. This hearsay exception applies to writings offered as memoranda or records of acts, conditions, or events to prove the facts stated therein,

> "if the following conditions are shown by the testimony of the custodian or other qualified witness, or by a certification that complies with K.S.A. 60-465(b)(7) or (8), and amendments thereto: (1) They were made in the regular course of a business at or about the time of the act, condition or event recorded; and (2) the sources of information from

8

which made and the method and circumstances of their preparation were such as to indicate their trustworthiness." K.S.A. 2023 Supp. 60-460(m).

For a domestic business record to meet this hearsay exception using a certification under K.S.A. 2023 Supp. 60-465(b)(7), the certification of the custodian or another qualified person must meet the requirements in K.S.A. 53-601—which states the certification may be established through an unsworn written declaration. K.S.A. 53-601 also requires that if the declaration is executed outside the state of Kansas, it must be in substantially the same form as: "'I declare . . . under penalty of perjury under the laws of the state of Kansas that the foregoing is true and correct.'" K.S.A. 53-601(a).

Kemp argues that Abruzzini's declaration for Oath Holdings failed to comply with the plain language of K.S.A. 53-601(a)(1) for declarations executed outside the state of Kansas—that the statement be true under penalty of perjury "'under the laws of the state of Kansas.'" For this reason, the accompanying records failed to meet the business-records hearsay exception of K.S.A. 60-460(m) and thus should have been excluded from the trial as hearsay. To decide this issue, we must decide if Abruzzini's declaration substantially complied with K.S.A. 53-601(a)(1).

A.   *Kemp preserved this issue for appeal.*

The State argues that Kemp failed to preserve this issue for appeal because Kemp's "only objection below was that he wanted a custodian to testify in person to lay foundation for Oath Holdings' records, and he added a relevance objection to State's Exhibit 23 at trial." The State notes that there was never any specific discussion about the validity of the business-records declaration or whether it met the statutory requirements of K.S.A. 53-601(a)(1).

9

Kemp counters that this issue is properly preserved for appeal. He states that after viewing Abruzzini's declaration for the first time at trial, he cited both K.S.A. 60-460(m) and K.S.A. 2023 Supp. 60-465(b)(7) in his hearsay objection regarding the records from Oath Holdings. We agree with Kemp that this issue was preserved for review.

K.S.A. 60-404 generally precludes an appellate court from reviewing an evidentiary challenge absent a timely and specific objection made on the record. *State v. Ballou*, 310 Kan. 591, 613-14, 448 P.3d 479 (2019). Here, the discussion at the pretrial hearing and again at trial involved defense counsel's request for the Oath Holdings' employee to testify. Kemp nonetheless objected that the records did not meet the requirements of K.S.A. 60-460(m), the business-records exception in the hearsay statute. Kemp also specifically cited K.S.A. 2023 Supp. 60-465(b)(7) in his trial objection. While the State is correct that there was never any specific discussion about Abruzzini's unsworn declaration and whether it met the statutory requirements of K.S.A. 53-601(a), Kemp still made a timely and specific objection to the evidence under K.S.A. 60-460(m) and K.S.A. 2023 Supp. 60-465(b)(7). We find this sufficient to review the hearsay issue on appeal.

The State also argues that Kemp's brief ignored the district court's "alternative bases" for admitting the email records from Oath Holdings (the court ruled that the records were business records and "admission by parties"). But in our view, the district court admitted the Oath Holdings records generally under the business-records hearsay exception and admitted Kemp's statements within the records (hearsay within hearsay) as admissions of a party. Because Kemp only challenges the *documents* under K.S.A. 60-460(m), he need not independently challenge the *content* of the email conversations—the second layer of hearsay—contained within the documents. Thus, Kemp properly preserved his argument for appeal.

B.       *The business-records declaration here substantially complied with K.S.A. 53-601(a)(1).*

Kemp argues that the records from Oath Holdings were inadmissible hearsay and that the business-records exception in K.S.A. 60-460(m) did not apply because the business-records certification did not comply with K.S.A. 2023 Supp. 60-465(b)(7). This is because K.S.A. 2023 Supp. 60-465(b)(7) requires in part "[c]ertified domestic records of a regularly conducted activity" to be certified by a custodian "in an affidavit or a declaration pursuant to K.S.A. 53-601."

This court reviews the admissibility of hearsay for abuse of discretion. *Gutierrez-Fuentes*, 315 Kan. at 351. Kemp argues that the district court abused its discretion by making an error of law in applying K.S.A. 2023 Supp. 60-460(m), K.S.A. 2023 Supp. 60-465(b)(7), and K.S.A. 53-601. The court's review of this potential legal error is unlimited. See 315 Kan. at 351.

*The business-records hearsay exception and the self-authenticating certification*

Hearsay is generally inadmissible unless a statutory exception applies. K.S.A. 60-460. K.S.A. 2023 Supp. 60-460(m) defines the business-records exception to the rule against hearsay:

> "Writings offered as memoranda or records of acts, conditions or events to prove the facts stated therein, if the following conditions are shown by the testimony of the custodian or other qualified witness, or by a certification that complies with K.S.A. 60-465(b)(7) or (8), and amendments thereto: (1) They were made in the regular course of a business at or about the time of the act, condition or event recorded; and (2) the sources of information from which made and the method and circumstances of their preparation were such as to indicate their trustworthiness."

11

For a party to admit a business record under K.S.A. 2023 Supp. 60-460(m) without live testimony from the record's custodian or through a business-records subpoena, the party must produce a self-authenticating certification that complies with K.S.A. 2023 Supp. 60-465(b)(7).

K.S.A. 2023 Supp. 60-465(b)(7) requires in part that any "[c]ertified domestic records of a regularly conducted activity" be certified by a custodian or other qualified person "in an affidavit or a declaration pursuant to K.S.A. 53-601." And under K.S.A. 53-601(a)(1)—for any unsworn written declaration *executed outside the state of Kansas*— the declaration must be in substantially the same form as: "'I declare (or verify, certify or state) under penalty of perjury under the laws of the state of Kansas that the foregoing is true and correct.'" K.S.A. 53-601(a). Practically speaking, because the declaration must only be in "substantially" the same form as is provided, a declaration need not strictly comply with the language provided by K.S.A. 53-601(a).

*Substantial compliance with K.S.A. 53-601(a)(1)*

Substantial compliance requires "'compliance in respect to the essential matters necessary to assure every reasonable objective of the statute.'" *A & S Rental Solutions, Inc. v. Kopet*, 31 Kan. App. 2d 979, 982, 76 P.3d 1057 (2003) (quoting *Mendenhall v. Roberts*, 17 Kan. App. 2d 34, 43, 831 P.2d 568, *rev. denied* 251 Kan. 939 [1992]). Stated another way, substantial compliance may be found where conduct "'complies with the spirit and intent of the law, but not with its absolute letter.'" *A & S Rental Solutions*, 31 Kan. App. 2d at 982 (quoting *Geiger-Schorr v. Todd*, 21 Kan. App. 2d 1, 6, 901 P.2d 515 [1995]).

Kemp argues that the declaration in this case failed to substantially comply with K.S.A. 53-601(a)(1) because for any declaration executed outside the state of Kansas, the declarant must certify "'under penalty of perjury under the *laws of the state of Kansas* that

12

the foregoing is true and correct.'" (Emphasis added.) K.S.A. 53-601(a)(1). Kemp notes that the out-of-state business-record certification in this case was declared to be true under the penalty of perjury of "the laws of the United States of America" instead of "the laws of the state of Kansas." To determine whether this certification is in substantial compliance with the statute, the court must analyze the spirit, intent, and reasonable objectives of K.S.A. 53-601(a).

Generally, K.S.A. 53-601 allows a statement subscribed by the person as true under the penalty of perjury to have the same force and effect as a sworn written declaration, verification, certificate, statement, oath, or affidavit. In determining the "spirit and intent" of K.S.A. 53-601(a)(1), the legislative history is helpful. When this statute was originally proposed as 1989 House Bill 2436, it was more limited and intended only to remove notary requirements for corporations executing annual reports, for persons assisting disabled voters, and for persons applying to become lobbyists. But the Kansas Bar Association requested the Legislature broaden the application of the bill and adopt the language in 28 U.S.C. § 1746. The KBA testified that "HB 2436 is such a good idea it should be expanded." Kansas Bar Association Testimony before House Judiciary Committee, HB 2436, Att. X, p.1 (February 28, 1989). The bill was then broadened, and K.S.A. 53-601 was passed into law, effective July 1, 1989, in substantially its current form. The Legislature thus followed the KBA's advice and codified K.S.A. 53-601 with very similar wording to that in 28 U.S.C. § 1746. The intent for both 28 U.S.C. § 1746 and K.S.A. 53-601 was to broadly reduce the requirement of using a notary public in lieu of a declaration under penalty of perjury.

This court has previously held that the Legislature's intent in enacting K.S.A. 53-601 was to codify the principle set forth in *State v. Kemp*, 137 Kan. 290, 20 P.2d 499 (1933). *Double S, Inc. v. Northwest Kansas Production Credit Ass'n*, 17 Kan. App. 2d 740, 744, 843 P.2d 741 (1992). *Kemp* held that a verified affidavit (through a notary public) had the same legal effect as if defendant was sworn according to the formalities

13

prescribed for administration of an oath—despite lacking certain statutory requirements. 137 Kan. at 293. Consistent with the rationale of the *Kemp* opinion, under K.S.A. 53-601, if a declarant understands the statement is true and understands they are under oath, the statement is valid despite the absence of the statutory formalities. *Double S, Inc.*, 17 Kan. App. 2d at 745. This purpose of the statute is at the heart of the substantial-compliance question in this case.

In *Commodity Futures Trading Comm'n v. Topworth Int'l, Ltd.*, 205 F.3d 1107, 1112 (9th Cir. 1999), the court analyzed 28 U.S.C. § 1746 and flexibly construed the statute for an issue similar to the issue presented here. The court upheld an out-of-country declaration that stated, "'I declare the foregoing to be true and correct under penalty of perjury under the laws of Hong Kong or any applicable jurisdiction.'" 205 F.3d at 1112. The court held that the out-of-country declaration "'under the laws of . . . any applicable jurisdiction'" substantially complied with the language of 28 U.S.C. § 1746, which required the declaration to be under the penalty of perjury of "'the laws of the United States of America.'" 205 F.3d at 1112.

Just as with 28 U.S.C. § 1746, the spirit and intent of K.S.A. 53-601 is to allow flexibility for receiving sworn testimony. In our view, the spirit and intent of K.S.A. 53-601(a)(1)'s requirement that the declaration be under penalty of perjury under "'the laws of the state of Kansas'" is to ensure reliability of the statement by: (1) requiring the declarant to make their statement under penalty of perjury; and (2) allowing the possibility of criminal prosecution in Kansas for knowingly making a false representation. Thus, if an out-of-state declaration meets these objectives, it is likely to be in substantial compliance with the form in K.S.A. 53-601(a)(1).

Kemp argues, "The declaration does not subject Ms. Abruzzini to penalty of perjury under the laws of the State of Kansas as required by K.S.A. 53-601(a)(1)." Kemp emphasizes that K.S.A. 53-601(a)(1) only has one single requirement for out-of-state

14

declarations—that the statement be true under penalty of perjury "'under the laws of the state of Kansas.'" Kemp thus contends that "failing to comply with the lone requirement of a statute could never be said to be substantial compliance." While Kemp's argument has some persuasive value, the spirit and intent of K.S.A. 53-601 is to allow flexibility for receiving sworn testimony. After careful review, we hold that the specific declaration in this case substantially complied with the form of declaration in K.S.A. 53-601(a)(1).

Again, the objective of K.S.A. 53-601(a)(1) is to ensure reliable declarations—similar to those signed under oath with a notary—while allowing some flexibility. This objective and the spirit and intent of this statute were met by the declaration of Abruzzini.

Although Abruzzini stated that her declaration was under penalty of perjury of "the laws of the United States of America"—instead of "the laws of the state of Kansas"—the declaration also stated that, "I make this declaration in response to a search warrant dated October 29, 2019 ('the request'). I have personal knowledge of the following facts . . . and could testify competently thereto if called as a witness." The search warrant was from a Kansas judge, and any such testimony would have been in Kansas if required. Abruzzini also included a letter with the records, which stated "Oath [Holdings] hereby produces the enclosed responsive data in accordance with state and federal law, including the Stored Communications Act. A declaration authenticating these records is also enclosed."

Thus, Abruzzini's unsworn declaration included the solemnity of being under the penalty of perjury, and it stated that this declaration was to be used to introduce evidence in a (Kansas) court in response to a specific (Kansas) search warrant. So Abruzzini both made her statements under penalty of perjury—albeit citing the wrong jurisdiction—but she also faced the possibility of a prosecution for perjury in Kansas if she knowingly provided false information in the business-records certification. See K.S.A. 21-5903(a)(2); K.S.A. 53-601(a); PIK Crim. 4th 59.010 (2018 Supp.) (stating the elements

15

of perjury); see also K.S.A. 21-5106(b)(3) (a crime is partly committed in Kansas if "the proximate result of such act, occurs within the state").

In other words, Abruzzini's unsworn declaration ensured reliability of the statement by: (1) requiring the declarant to make her statement under penalty of perjury; and (2) allowing the possibility of criminal prosecution in Kansas if she knowingly provided false information in the business-records certification. Given the flexibility that was originally intended by K.S.A. 53-601, we hold that Abruzzini's unsworn declaration was in substantial compliance with the form stated in K.S.A. 53-601(a)(1). See also *Chubb v. Sullivan*, 50 Kan. App. 2d 419, 446-47, 330 P.3d 423 (noting that an affidavit signed stating "'I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct'" was sufficient to satisfy K.S.A. 53-601), *rev. denied* 300 Kan. 1103 (2014).

We pause, however, to explain what we do not hold in this opinion. We do not hold that a declaration under penalty of perjury of "the laws of the United States of America" is generally in substantial compliance with K.S.A. 53-601(a)(1). The out-of-state written declaration under K.S.A. 53-601(a)(1) has many uses in the law—and if done correctly, has the same force and effect as a sworn written declaration, verification, certificate, statement, oath, or affidavit. Despite the holding in this case, any party seeking to use such an out-of-state declaration should pay close attention to the declaration to ensure that it is sworn to under penalty of perjury of "the laws of the state of Kansas." The facts of the declaration providing substantial compliance here will likely not be replicated by many of the intended uses for an unsworn declaration under K.S.A. 53-601(a)(1).

Nonetheless, the unsworn declaration in this case contained enough additional information to substantially comply with the form stated in K.S.A. 53-601(a)(1). Because the declaration stated that it was in response to a specific (Kansas) search warrant,

16

included the solemnity of being under the penalty of perjury, and it allowed the possibility of criminal prosecution in Kansas if the declarant knowingly provided false information, the declaration was in substantial compliance with K.S.A. 53-601(a)(1). This interpretation is consistent with the original objective of K.S.A. 53-601—to allow for flexibility over form when receiving sworn statements in lieu of live testimony in Kansas courts.

We also pause to note that we do not make any ruling on the constitutionality of the admission of the records from Oath Holdings. Kemp has not suggested the introduction of the records implicated any constitutional right under the Confrontation Clause in the Sixth Amendment to the United States Constitution or section 10 of the Kansas Constitution Bill of Rights, so we do not consider that possibility.

Accordingly, the district court did not err by admitting the out-of-state records from Oath Holdings. The records were otherwise admissible, and the records were not subject to exclusion as hearsay because they met the statutory hearsay exception for business records under K.S.A. 2023 Supp. 60-460(m). The out-of-state declaration under K.S.A. 2023 Supp. 60-465(b)(7) was in substantial compliance with K.S.A. 53-601(a)(1).

II.    *The prosecutor committed error in voir dire during the discussion of the meaning of "beyond a reasonable doubt." But this error was harmless.*

Kemp also argues that the prosecutor misstated the law and diluted the State's burden of proof during voir dire by asking the prospective jurors whether they could set a personal standard for reasonable doubt. He argues that this constituted reversible prosecutorial error under the holding of *State v. Magallanez*, 290 Kan. 906, 914, 235 P.3d 460 (2010). The State contends that the prosecutor's closing remarks were not error and, alternatively, that any error was harmless.

17

We use a two-step process to evaluate claims of prosecutorial error: error and prejudice. *State v. Sieg*, 315 Kan. 526, 535, 509 P.3d 535 (2022). To determine whether an error occurred, "'the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial.'" 315 Kan. at 535.

If there is error, we next determine whether that error "'prejudiced the defendant's due process rights to a fair trial.'" 315 Kan. at 535. Kansas has adopted "'the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)].'" *Sieg*, 315 Kan. at 535. Prosecutorial error is harmless if the State can demonstrate "'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' [Citation omitted.]" 315 Kan. at 535.

A.      *Voir dire discussion*

Before either party began their portions of the voir dire, the district court told the potential jurors:

> "The State has the burden of proof—and we'll talk to you about this—to try to show that Mr. Kemp is guilty beyond a reasonable doubt. And he pleads not guilty to every one of these charges. To establish this and to try to prove their case, the State will have elements that they have to reach. We will instruct you as to what those elements are as we get near the end of the trial."

The prosecutor opened the State's questioning by asking a few potential jurors whether they had ever heard of the phrase "beyond a reasonable doubt." Those potential jurors replied that they had heard the phrase in popular media such as movies and TV.

18

The prosecutor next asked, "would it surprise you to learn that no one, none of the attorneys in this room, are going to tell you what that phrase means?" The first potential juror answered "[n]o" and followed up that "[t]hey want us to form our own opinion." The prosecutor agreed, "Yeah. Absolutely." The prosecutor then asked the next potential juror the same question. They stated, "I'm going to agree with the last statement because, I mean, they want everybody to have their own opinion. That way it stays fair."

The prosecutor continued with this topic and asked multiple potential jurors the same basic question—"do you feel that you can set for yourself where that standard lies in your mind?" The prosecutor also asked the potential jurors if they could "talk about that standard with a group of 11 other people and decide as a group where that line is?" Throughout this topic, the prosecutor asked multiple potential jurors if they could "give those words [beyond a reasonable doubt] the meaning that they deserve?"

After this discussion of the lack of a definition for "beyond a reasonable doubt," the prosecutor then explained that the jurors would get instructions at the end of trial, and one of those instructions would talk about the State's burden of proof. The prosecutor proposed a hypothetical where the jury felt the State proved the first three elements of a crime, but the fourth element was lacking. The prosecutor asked various potential jurors whether they would select "guilty" or "not guilty" on the verdict form.

The first potential juror replied, "Gosh. Since it's lacking information, I guess it'd be not guilty." The prosecutor replied, "Okay. Yeah, because I haven't done my job; right? I haven't proven that element of the case. All right." The next potential juror responded, "Not guilty," explaining that the State would not have "proven without a reasonable doubt all four items." The prosecutor then asked a similar hypothetical to eight more potential jurors, each with similar responses.

19

On the eleventh potential juror, the prosecutor asked, "I think we've kind of hit—beat this horse at this point, but if I only prove three of the elements out of four that I'm required to prove, would you find someone guilty or not guilty in that situation?" This potential juror replied, "Not guilty." The next potential juror agreed, "No free passes."

The prosecutor then moved on to the concept of "presumption of innocence." She asked a potential juror whether he had ever heard of the phrase, and he replied, "Not really." The prosecutor then asked him what he thought it meant, to which the potential juror replied, "You're innocent until proven guilty." The prosecutor affirmed—"Exactly. Innocent until proven guilty."

The prosecutor then proposed a hypothetical scenario where it presented no witnesses, no pictures, no discussion of anything, and the jurors were sent back to start deliberating. Would the potential juror choose guilty or not guilty? The potential juror replied, "Not guilty because I wasn't given anything to deliberate for." The prosecutor replied, "Yeah. Exactly."

The prosecutor also addressed any concern that potential jurors' personal bias could impact Kemp's right to a fair trial. One potential juror raised his hand and said that he might be biased due to the subject matter and had the following discussion with the State:

> "MS. HOYT: . . . [Potential Juror], just since you raised your hand this last time. So if I'm required to prove those four elements, you are picked to be a juror and you are told immediately to start your deliberations without seeing any evidence whatsoever, what would your verdict be? Guilty or not guilty in this situation?
> "POTENTIAL JUROR []: Without any evidence it would have to be not guilty.
> "MS. HOYT: Okay. And I know we're talking about a subject matter that some people find, you know, concerning, reprehensible. There's lots of other adjectives or

words we can use for that, but when it comes to those three elements, if I do not prove that fourth element, are you giving me a free pass?

"POTENTIAL JUROR []: No.

"MS. HOYT: Even though it's a case involving child pornography?

"POTENTIAL JUROR []: I go by a code: It's better to have ten guilty men go free lest one innocent man goes to jail.

"MS. HOYT: There we go. So if I prove those four elements to you and there is something else that you want to know more about but it's not one of those required elements, do you want me to prove more than what's required under the law?

"POTENTIAL JUROR []: No. I might ask the judge for guidance on something though.

"MS. HOYT: Okay. Yeah."

These various exchanges reflect the general tone of the State's voir dire. Kemp's attorney even highlighted the prosecutor's theme when he began his questioning:

"MR. MANK: . . . As Ms. Hoyt said, we're trying to pick 12 jurors who we feel are fair and impartial to the State and to the defendant. I like to say I'm looking for 12 jurors that I like, she's looking for 12 jurors that she likes, and we end up with 12 jurors that don't like either one of us.

"(Courtroom laughter.)

"MR. MANK: But that's what I'm doing. I mean, I'm trying to do the best job that I possibly can for Mr. Kemp. I represent him and it's my job to make sure that the State proves him guilty beyond a reasonable doubt. And that's what she's asking you. Can you hold her to that standard, and if they don't meet that standard, he's not guilty."

At the close of trial, the court instructed the jury on the State's burden of proof in Instruction No. 2:

"The State has the burden to prove the defendant is guilty. The defendant is not required to prove he is not guilty. You must presume that he is not guilty unless you are convinced from the evidence that he is guilty.

21

"The test you must use in determining whether the defendant is guilty or not guilty is this: If you have a reasonable doubt as to the truth of any of the claims required to be proved by the State, you must find the defendant not guilty. If you have no reasonable doubt as to the truth of each of the claims required to be proved by the State, you should find the defendant guilty."

Consistent with Kansas law, the district court did not define the phrase "beyond a reasonable doubt."

B. *The voir dire discussion of "beyond a reasonable doubt" included some prosecutorial error.*

Kemp argues for the first time on appeal that the prosecutor committed error during voir dire by agreeing with a potential juror that there would be no definition of "beyond a reasonable doubt" because "[t]hey want us to form our own opinion"—and by asking multiple potential jurors, "do you feel that you can set for yourself where that standard lies in your mind?" Kemp does not argue that the prosecutor erred during closing arguments or any other part of the trial.

Appellate courts will review a prosecutorial-error claim based on a prosecutor's comments made during voir dire, opening statement, or closing argument even without a timely objection. But the court may figure the presence or absence of an objection into its analysis of the alleged error. *State v. Bodine*, 313 Kan. 378, 406, 486 P.3d 551 (2021).

Kemp claims that asking the prospective jurors whether they could set a personal standard for reasonable doubt is no different than the prosecutorial error in *State v. Magallanez*, 290 Kan. 906. In *Magallanez*, the prosecutor stated during closing arguments that "'[r]easonable doubt is not beyond any doubt, it's an individual standard. It's a standard that when you believe he's guilty you've passed beyond a reasonable doubt.'" 290 Kan. at 912.

Generally, the prosecutor's comments in voir dire at Kemp's trial were not in the same ballpark as the prosecutor's closing arguments in *Magallanez.* Kemp's prosecutor talked to the jury panel about the fact that the judge was not going to define "beyond a reasonable doubt." She discussed with the panel that each juror would have to make that decision for themselves. She also asked the potential jurors if they could set where that standard was in their own mind. These comments were not prosecutorial error.

The erroneous phrase in *Magallanez* was the prosecutor telling the jury "'when you believe he's guilty you've passed beyond a reasonable doubt.'" This was the phrase that incorrectly defined and impermissibly diluted the State's burden to prove the defendant guilty "beyond a reasonable doubt." 290 Kan. at 914-15. The court reasoned, "A juror's mere belief that an accused individual is guilty does not automatically mean that the State has met its burden." 290 Kan. at 914 (citing *State v. Brinklow*, 288 Kan. 39, 49-50, 200 P.3d 1225 [2009] [prosecutor erred when they told jury reasonable doubt was satisfied when the jury "'just know[s]'" defendant was guilty]).

The prosecutor's questions emphasized most strongly by Kemp—whether potential jurors could "set for yourself where that [beyond-a-reasonable-doubt] standard lies in your mind"—were not the same type of argument as in *Magallanez* and *Brinklow*. This discussion was more similar to the closing arguments in *State v. Wilson*, 281 Kan. 277, 286, 130 P.3d 48 (2006), where a prosecutor said to the jury, "'I want you to look at the evidence, remember all the testimony that you heard, and go back to that definition of reasonable doubt that, unfortunately, *no one can say in precise words what it is*. *You just have to intuitively know when you see it*.'" (Emphasis added.) This statement in *Wilson* complied with the appropriate description for reasonable doubt that "'[N]o definition or explanation can make any clearer what is meant by the phrase "reasonable doubt" than that which is imparted by the words themselves.'" 281 Kan. at 287 (quoting *State v. Walker*, 276 Kan. 939, 956, 80 P.3d 1132 [2003]).

23

Like the prosecutor's argument in *Wilson*, the prosecutor in Kemp's trial asked potential jurors "would it surprise you to learn that no one, none of the attorneys in this room, are going to tell you what that phrase [beyond a reasonable doubt] means?" She also discussed with the panel that each juror would have to make that decision for themselves. And she asked the potential jurors if they could set where that standard was in their own mind. These questions were much more like the acceptable statements in *Wilson* than the erroneous arguments in *Magallanez* and *Brinklow*. The prosecutor did not argue that the beyond-a-reasonable-doubt standard is met when a juror merely "believes" the defendant is guilty or when a juror "just knows" that the defendant is guilty. Instead, the prosecutor asked the prospective jurors if they could make that determination even though the court was not going to define that term for them. That is a key difference and is generally permissible.

But the prosecutor's questions in voir dire were not error-free. During the discussion of "beyond a reasonable doubt," the prosecutor asked multiple potential jurors if they could "talk about that standard with a group of 11 other people and decide as a group where that line is?" This suggested that the jury could discuss and then vote on the standard for "beyond a reasonable doubt."

We find that these questions impermissibly diluted the State's burden to prove the defendant guilty "beyond a reasonable doubt." See *Magallanez*, 290 Kan. at 914-15. Generally, jurors are tasked with deciding whether the evidence in a case exceeds the fixed legal standard of "beyond a reasonable doubt." But jurors do not get to decide "where that line is." Thus, for this series of questions, we conclude that the prosecutor's comments diluted the State's burden to prove Kemp guilty "beyond a reasonable doubt" by suggesting that the jurors could discuss and vote on the meaning of the phrase "beyond a reasonable doubt." For this reason, these questions fell outside the wide latitude afforded the prosecutor at trial.

24

C.      *The prosecutorial error was harmless.*

Because we find that Kemp's trial included some prosecutorial error, the next step is to determine whether that error "'prejudiced the defendant's due process rights to a fair trial.'" *Sieg*, 315 Kan. at 535. Kansas has adopted "'the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)].'" 315 Kan. at 535. Prosecutorial error is harmless if the State can demonstrate "'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' [Citation omitted.]" 315 Kan. at 535.

The State argues in its brief that the prosecutor's comments regarding reasonable doubt—if erroneous—"did not adversely affect the outcome of the trial in any way." We agree.

The prosecutor's erroneous comments were limited to voir dire, were included within a broader appropriate discussion of the presumption of innocence and the burden to prove every element beyond a reasonable doubt, were followed by error-free closing arguments from both counsel, and were mitigated by jury instructions that correctly stated the law regarding reasonable doubt. In addition, the evidence against Kemp, although not thoroughly discussed here, was significant.

For these reasons, the State can demonstrate beyond a reasonable doubt that the prosecutorial error did not affect the outcome of the trial in light of the entire record. In other words, there is no reasonable possibility that the error contributed to the verdict.

III.     *Cumulative error did not deny Kemp a fair trial.*

Lastly, Kemp argues that cumulative error denied him the right to a fair trial in this case. But the cumulative error rule does not apply if there are no errors or only a single error. *State v. Gallegos*, 313 Kan. 262, 277, 485 P.3d 622 (2021). Thus, the cumulative-error rule does not apply here because Kemp has failed to establish more than one trial error.

For these reasons, we reject Kemp's challenges to his convictions and his sentence.

Affirmed.